DECISION
This case is before the Court on appeal from a decision of the Law Enforcement Officer's Bill of Rights (LEOBR) Hearing Committee. G.L. 1956 § 42-28.6-1 et seq. William Blais (Appellant or Blais) Appellant is contesting his 25 day suspension without pay. Jurisdiction is pursuant to § 42-18.6-12.
 I Facts and Travel
Appellant, while on duty as a police officer, was involved in a physical altercation with another officer. This altercation took place in the presence of a dispatcher and civilian who was present as part of the "citizen ride along program."
Appellant was served with a "charging letter" laying out the charges against him and a recommended 60 day suspension without pay. Pursuant to the LEOBR, Appellant requested a hearing.
The LEOBR Hearing Committee (Committee) heard testimony over four days in November, 2008. Closing arguments occurred December 8, 2008. At these hearings, testimony was heard by the two combatants, as well as those who witnessed portions of the altercation and those officers who conducted the investigation. The Committee, in a *Page 2 
written decision dated December 19, 2008, found the Appellant, Officer Blais (Blais) guilty of seven counts of misconduct in violation of chapter 2 of the Burrillville Police Department Rules and Regulations (Department Rules). The different versions of events and testimony before the Committee follow.
Blais, Officer Bouchard (Bouchard), Officer Kelly (Kelly) and Dispatcher Biddiscombe (Biddiscombe) all worked the four to midnight shift at the Burrillville Police Department on May 1, 2008. Because no sergeant or lieutenant was on this shift, Blais, the most senior patrolman, was the officer in charge (OIC). Also present that night was Lisa Simpson (Simpson), a civilian who was participating in the ride-along program as part of a Citizens Police Academy event. (Decision at 9.) Early in the shift, Bouchard and Blais disagreed about an issue regarding consent to search a vehicle. Blais told Bouchard to "get consent" to search the vehicle, and Bouchard, believing he did not have probable cause to search the vehicle, called Lieutenant San Antonio (San Antonio) to ask him what he should do. (Tr. Nov. 12, 2008 at 36-37; Tr. Nov. 24, 2008 at 9-10.) Bouchard informed Blais that San Antonio had told him not to search the vehicle and Blais informed Bouchard about following the chain of command on that shift. (Tr. Nov. 24, 2008 at 11-12.)
Later that night, Blais asked Bouchard to fingerprint a prisoner who had already been fingerprinted on an arson charge. Blais wanted him to re-fingerprint the prisoner on a marijuana charge. Bouchard refused to fingerprint the prisoner because he stated he could change the "demographic" on the machine. (Tr. Nov. 12, 2008 at 45-48). Blais informed Bouchard that he had previously spoken to a higher officer and was informed that they were not to do the fingerprinting that way because it could lead to errors in the *Page 3 
machine reading the prints. (Tr. Nov. 24, 2008 at 16.) Blais asked Bouchard four times to re-fingerprint the prisoner, but Bouchard refused to do so, insisting he could do it on the computer.Id. at 75. Eventually, Blais brought the prisoner into the Bureau of Criminal Investigation and told Bouchard to leave, and Blais did the fingerprinting himself. Id. at 18-20.
Bouchard testified that after Blais re-fingerprinted the prisoner and returned him to the cell, Blais came to the dispatch room where Biddiscombe, Simpson and Bouchard were located and asked to speak with him. (Tr. Nov 12, 2008 at 50-51.) According to Bouchard, the two got into a verbal altercation during which Blais called him a "dirty rat," and Bouchard said he was just mad because the department was looking at his "buddy" for stealing money.Id. at 53-54. At that point, Bouchard contends, Blais chest bumped him three times as Bouchard stepped back each time. Blais then punched Bouchard with his right arm on the left side of Bouchard's face; he then punched Bouchard a second time in the face. Bouchard stated that after he was punched twice in the face, he started "throwing punches" at Blais. Id. at 55-57. Bouchard further explained that he had Blais on his knees and was punching Blais in the head when Biddiscombe pulled Bouchard back and away from Blais. Bouchard testified that at this point, there was a lull in the fighting, but Blais got up off the floor and charged at him. Bouchard further stated he broke free of Biddiscombe and got Blais back on the floor on his hands and knees and held him there, and then the fighting stopped. Id. 57-60.
Simpson testified that she was in the dispatch room with Biddiscombe and Bouchard when Blais entered. Blais asked Bouchard if he could talk to him if he wasn't doing anything, and Bouchard followed him out. Id. at 163. Simpson stated that she *Page 4 
could hear loud voices, and at one point, it sounded like papers were being thrown. When she heard the sound like papers were being thrown, she ran out of the dispatch room to the noise which was coming from the squad room about 25 feet away.Id. at 166-68. Upon walking into the room, she noticed Blais had his back to the door, and Bouchard was facing her direction, but she did not think he saw her. She stated that the two were standing "too close" together, and there was some yelling, although she could not make out who was yelling or what they were saying.Id. at 171-72. Simpson further stated they both chest bumped each other, but Bouchard was stepping back a bit. Id.
Additionally, she stated that Blais threw the first punch and struck Bouchard in the right eye. Bouchard stepped back, and then Blais punched him again in the face. Id. at 175. When Bouchard punched back at Blais, she stated that she tried to get in between the two but got "thrown" and then was stuck between the podium and the table. She testified that she yelled, "stop it," but neither noticed her. Id. at 176-77.
Biddiscombe entered at this time, and she stated he told her to get the radio from the dispatch room. She left, and when she returned, she stated Blais was on all fours on the ground, Bouchard was standing above him, with his hand on Blais's back and Biddiscombe was between the two with a hand on each shoulder. She then stated that as Blais got up, he swung at Bouchard, and Biddiscombe pushed Bouchard out of the room. Id. at 180. Simpson further testified that there was blood on the floor, the podium was in pieces, the tables were turned over, there were papers all over the floor, and the contents of her purse were strewn about the floor. Id. at 184.
Biddiscombe testified that he, Simpson, and Bouchard were in the dispatch area when Blais entered and asked Bouchard if he was "busy," and Bouchard walked out with *Page 5 
him. (Tr. Nov. 13, 2008 at 15.) He heard yelling and heard what sounded like a table being "slid across" the floor.Id. at 22. Biddiscombe was ending a phone call when he saw Simpson leave the dispatch room in response to the sound. He ended the call and quickly entered the squad room. Id. at 23-24. When he entered, Blais was on his hands and knees and Bouchard was on top of him hitting him with his right hand. Id. at 25. Biddiscombe testified that he tried to pull off Bouchard, but it was harder than he thought, and all three ended up standing in a "bear hug" and moving backward toward the wall with the phone on it. When they hit the wall, they "broke free," and Blais was able to get a hand free to swing at Bouchard. At this point, they all "tripped" over the table and into the podium, which broke.Id. at 29-33. Biddiscombe testified that all three ended up in a pile on the floor; he then lifted Bouchard up and pushed him through the door. Biddiscombe further testified that Bouchard then left the station. Id. at 33-34. Biddiscombe then stated he took Blais to the dispatch room to attend to Blais's wounds, because Blais was bleeding and there was swelling of his face. Once he assessed the injuries, he went outside to check on Bouchard.Id. at 36.
Blais offered a different account of the physical altercation. He testified that he went into the dispatch room after fingerprinting the prisoner, and told Bouchard to "get on the road" if he wasn't doing anything. He explained this meant to do a loop of his designated area before the end of the shift. Blais stated that Bouchard made a comment as Blais walked out of the room. (Tr. Nov 24, 2008.) Blais then testified that he went to the copy machine, which is located in the hallway between the dispatch room and the squad room, to make copies to finish the prisoner's paperwork. He stated that Bouchard followed him to the copy machine and was yelling at him. Blais testified that he told *Page 6 
Bouchard to "get on the road" again, and then Blais walked to the podium in the squad room to finish the paperwork.Id. at 26-27.
He then testified that Bouchard followed him in there and was pacing by the computers calling Blais a "rat fuck," "just like McBrier." Id. at 27. Blais then testified that he went over towards Bouchard to get a paperclip, and Bouchard stepped in his way. Blais further testified that after Bouchard blocked his path three times, Bouchard then pushed him and punched him in the face. He stated that Bouchard pushed him backwards into the podium and over the table and continued to punch him while he was lying on the ground with his hands over his head. Id. at 31. Blais stated that at this point, he could see Biddiscombe's legs, and he was yelling to get him to stop Bouchard; he said it felt like Bouchard backed up, but he kept holding onto Bouchard's shoulder behind him, and eventually, they were all standing. He stated that he got Bouchard off him, but Bouchard was still trying to hit him, so Blais pushed Bouchard and started swinging at him. Blais stated that Bouchard again punched him and hit him in the nose for the second time. He believed this was the punch that broke his nose. Blais testified that he was on the ground again on his hands and knees and noticed the blood dripping on the floor when the fight stopped. Id. at 34-38. He stated that when he punched back at Bouchard it was in self-defense. Id. at 37-38.
As a result of the altercation, Blais was out of work for 50 days with two fractured ribs, a fractured nose, puncture wounds through his hand, a bruised tailbone and a torn tendon in his right shoulder. Id. at 36, 45-46. The night of the altercation, he was wearing armor. Id. at 36. *Page 7 
After the fight, Bouchard called Kelley back to the station, and Lieutenants San Antonio and Guglietta were called to the station to begin the investigation. Kelley testified that she was called to the scene by Bouchard, and when she arrived, he was sitting outside in his patrol car. She further testified that she spoke with Bouchard, and he was still outside with her when she saw a car, which she believed one of the lieutenants was driving, enter the lot and station. (Tr. Nov. 13, 2008 at 186). Additionally, she testified that after she entered the station, she asked Blais if he needed any medical attention, and he informed her that he was going to the hospital on his own after the shift was over.Id. at 197, 227-228.
Lieutenant Guglietta (Guglietta) testified that he had been called to the station to interview both officers. He testified that he and San Antonio informed Blais that he was suspended without pay and asked if he wanted to give a statement. Guglietta stated that Blais refused to give a statement because he wanted to go to the hospital. Guglietta testified that San Antonio then asked Blais if he wanted a ride to the hospital; Blais told him he had already called for someone to pick him up. Id. at 107-108. After Blais left the station, Guglietta testified that he then asked someone to get Bouchard at which point he informed Bouchard he was suspended as well. Id. at 113. Blais submitted a written statement to the State Police, which was also submitted to the Burrillville Police Department, that stated in part:
 [A]round 2345 Lt. SanAntonio arrived at the station and Lt. Guglietta arrived shortly thereafter. I saw both Lts SanAntonio and Guglietta meet privately with Officer Bouchard behind closed doors. At no time was I ever approached by either lieutenants about the matter, nor was a rescue offered to me by anyone but Biddiscombe. (Decision at 8-9.) *Page 8 
Guglietta further testified that once he read Blais's statement, he reviewed the security cameras from that night and saw that Bouchard did not enter the station between the time Guglietta entered and Blais left. Id. at 132-33. Guglietta's testimony was confirmed by that of San Antonio, who was present in the room during both interviews and testified that he offered Blais a ride to the hospital. (Tr. Nov. 19, 2008 at 14-18.)
Blais testified that at the time he made the statement, he thought Bouchard was in the room with both lieutenants based on what he heard from someone else and the fact that San Antonio's door was closed and he could not find anyone in the station. (Tr. Nov 24, 2008 at 42.) He further testified that he only spoke to Guglietta after he was ready to leave for the hospital.Id. at 137-138. Lastly, he stated in his testimony that the lieutenants lied in their testimony when they stated they asked him if he needed medical attention because they were "covering themselves." Id. at 135-136.
Based on the evidence and testimony before it, the three-person Committee, in a fourteen page written decision, dated December 19, 2008, unanimously found Blais guilty of the seven charges against him. He was found guilty of violating seven of the Department Rules. These violations were standard of conduct § 2.5, rules governing conduct § 2.6, performance of duty § 2.9, courtesy § 2.12, demeanor § 2.13, conduct towards personnel and department § 2.14, and truthfulness § 2.18. The Committee made specific findings of fact as to each charge based on the testimony and evidence before it. The Committee further assessed whether it was necessary to order disciplinary action for each charge. The Committee found Blais was the aggressor and ordered Blais to a 25 working day unpaid suspension. Blais timely appealed that decision to this Court. *Page 9 
 II Standard of Review
Under the LEOBR, an officer who is facing charges may request a hearing before a hearing committee composed of three officers, active or retired. These three hearing officers must have had no involvement in the underlying investigation of the officer. Sec. 42-28.6-1 et seq. The burden of proof is on the charging law enforcement agency. Sec. 42-28.6-11(c). The hearing committee is given broad discretion when making its decision and can modify in whole or in part the recommendations of the charging authority. The hearing committee is not bound by any of the recommendations of the charging authority. Culhane v.Denisewich, 689 A.2d 1062, 1064 (R.I. 1997).
If an officer is aggrieved by the decision of the Hearing Committee, the LEOBR allows for an appeal to the Superior Court. Section 42-28.6-12 lays out the requirements for this appeal, stating in part,
 [a]ppeals from all decisions by the hearing committee shall be to the superior court in accordance with §§ 42-35-15 and 42-35-15.1. For purposes of this section, the hearing committee shall be deemed an administrative agency and its final decision shall be deemed a final order in a contested case within the meaning of §§ 42-35-15 and 42-35-15.1." Sec. 42-28.6-12.
Therefore, this Court is bound to follow the standard of review set forth in Gen Laws § 42-35-15(g), which provides:
 The court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court may affirm the decision of the agency or remand the case for further proceedings, or it may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
 (1) In violation of constitutional or statutory provisions; *Page 10 
 (2) In excess of the statutory authority of the agency;
 (3) Made upon unlawful procedure;
 (4) Affected by other error or law;
 (5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
 (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.
When reviewing the decision of an agency, this Court must not substitute its judgment for that of the reviewing agency regarding the credibility of witnesses and the weight of the evidence concerning questions of fact. Ctr. for Behavioral Health v.Barros, 710 A.2d 680, 684 (R.I. 1998); Costa v. Registrar ofMotor Vehicles, 543 A.2d 1307, 1309 (R.I. 1988). This is true even in cases where the court, after reviewing the certified record and evidence, may be inclined to view the evidence in a different manner than the agency. Barrington Sch. Com. V. Labor Re.Bd., 608 A.2d 1126, 1138 (R.I. 1992). The Court must instead confine itself to a review of the record to determine if legally competent evidence exists. If competent evidence exists in the record when considered as a whole, the Court must uphold the agency's decision. Barrington Sch. Com., 608 A.2d 1126, 1138. Legally competent evidence is defined as the presence of some or any evidence supporting the agency's findings. Sartor v. CoastalResources Management Council, 542 A.2d 1077, 1082-83 (R.I. 1988). The Court may reverse factual findings of an agency only when they are completely devoid of competent evidentiary support in the record. Milardo v. Coastal Resources Management Council,434 A.2d 266, 272 (R.I. 1981).
This Court will uphold an agency decision if the agency's decision is supported by substantial evidence. Berberian v. Dept. ofEmployment Sec., 414 A2d 480, 482 (R.I. 1980); Cahoone v.Board of Review of Dept. of Employment Sec.,104 R.I. 503, 506, 246 A.2d 213, *Page 11 
215, (1968). "Substantial evidence" is defined as "such relevant evidence that a reasonable mind might accept as adequate to support a conclusion, and means an amount more than a scintilla but less than a preponderance." Newport Shipyard v. Rhode IslandCommission for Human Rights, 484 A.2d 893, 897 (R.I. 1984) (quoting Caswell v. George Sherman Sand Gravel Co.,424 A.2d 646, 647 (R.I. 1981)). However, the agency will review de novo questions of law. Johnston Ambulatory Surgical Associates,Ltd. v. Nolan, 755 A.2d 799, 805 (R.I. 2000).
 III Analysis A Application of the Rules and Penalties
The Appellant argues that his 25 day suspension without pay constitutes an uneven application of the rules and penalties among similarly situated officers and, therefore, the Committee abused its discretion when it imposed the 25 day suspension. He further claims that this suspension was arbitrary and capricious because the penalty imposed on Bouchard was far less, a two day suspension, for similar conduct[1].
Darren Delaney, in his capacity as chairperson of the Hearing Committee (Apellee), responds that the two officers were not similarly situated as the Committee ruled that Appellant was the aggressor and Bouchard acted in self defense. The Appellee further notes that the Committee charged Appellant with "untruthful statement" and that charge further distinguished Blais from Bouchard. *Page 12 
This Court cannot substitute its judgment regarding credibility of witnesses and the weight of evidence in regard to findings of fact.Barros 710 A.2d 684. Therefore, this Court must rely on the findings of fact found by the Committee. This Court recognizes that a hearing Committee's sanction determination involves not only a consideration of the specific facts but also the application of administrative judgment and discretion. Kulkin v.Bergland, 626 F.2d 181, 184 (1st Cir. 1980). Therefore, the prevailing view has been that the review of the sanction conducted by this Court requires that the penalty be upheld unless it is unwarranted in law or is without justification of fact.Broad Street Food Market Inc. v. U.S.,720 F.2d 217 (1st Cir. 1983); Collazo v.U.S., 668 F.2d 60 (1st Cir. 1981). With respect to enforcement power of an administrative agency, the choice of a sanction is `peculiarly a matter for administrative competence.'Broad Street 720 F.2d at 220.
The Committee specifically stated:
 [t]he verbal dispute escalated into a physical altercation which you initiated by punching Patrolman Bouchard. The investigation revealed that after the initial exchange of punches Dispatcher Biddiscombe managed to separate the two of you. . . . While Patrolman Bouchard was being restrained, you renewed the combat by getting up and swinging at Bouchard again. (Decision at 4.)
The Committee heard testimony from Blais, Bouchard, Biddiscombe, Simpson and others. The Committee, in its decision, found that Blais was the aggressor in this situation. (Decision at 4.) Biddiscombe testified that he had been holding Bouchard and the three were in a "bear hug" until they hit the wall and Blais broke free and immediately swung at Bouchard. (Tr. Nov, 13, 2008 at 29, 77-81.) Simpson, a citizen witness, stated that she had entered the room when the two were "chest bumping" and *Page 13 
then she saw Appellant strike Bouchard twice in the face. (Tr. Nov. 12, 2008 at 175.) She further stated that Blais "threw the first punch." Id. Bouchard's testimony was that Blais was the aggressor in this case, and he only responded after Blais hit him twice in the face. Id. at 57. There is substantial evidence in the record that Blais was the aggressor and that the penalty was further based on the fact that Blais was considered the OIC that evening and placed in a position of trust. (Tr. Nov. 19, 2008 at 97.)
Additionally, the Committee found that Blais made untruthful statements which also added to the consideration of his penalty. The Committee stated:
 You were not truthful in the written statement dated May 2nd, 2008 that you submitted to the Rhode Island State Police and to Lieutenant Lareto Guglietta. In this statement, documenting your account of the events of May 2nd. 2008, you wrote, "around 2345 Lt. SanAntonio arrived at the station and Lt. Guglietta arrived shortly thereafter. I saw both Lts SanAntonio and Guglietta meet privately with Officer Bouchard behind closed doors. At no time was I ever approached by either lieutenants about the matter, nor was a rescue offered to me by anyone but Biddiscombe." In truth, shortly after midnight on May 2nd, Lieutenant Guglietta brought you to Lieutenant San Antonio's office, at that time you were advised by Lieutenant San Antonio that you were being suspended. The lieutenant offered you the opportunity to give a statement and informed you that Lieutenant Guglietta was assigned to do an internal investigation. You told the lieutenant that you wanted to go to the hospital. The lieutenant offered you a ride. You refused stating that Sergeant McBrier was on the way to take you to the hospital. Patrolwoman Kathleen Kelley reported that she asked you if a rescue had been summoned and you again replied that Sergeant McBrier was taking you to the hospital. During this entire time Patrolman Bouchard waited outside. Patrolman Bouchard did not enter the police station and his meeting with Lieutenant SanAntonio was subsequent to your leaving the station. (Decision at 8-9.) (Italics in original). *Page 14 
There was testimony before the Committee from Guglietta that after he received the statement from Blais, he reviewed security tapes from that night, and Bouchard did not enter the building between the time Guglietta entered and Blais departed. (Tr. Nov. 13, 2008 at 133-132.) He also testified that San Antonio offered to give a ride to Blais so that Blais could seek medical attention. Id. at. 107-108. San Antonio confirmed Guglietta's statements that he offered to give Blais a ride to the hospital. He also stated that they interviewed Blais before Bouchard. (Tr. Nov. 19, 2008 at 14-18.) Kelley additionally offered testimony that when she entered the station and saw Blais, she asked if he wanted medical attention and he told her he would go to the hospital after his shift. (Tr. Nov. 13, 2008 at 147, 227-28.) On the evidence before it, the Committee found Blais guilty of making untruthful statements.
Reviewing the record as a whole, this Court finds that the Committee's decision was not an abuse of discretion or arbitrary and capricious. There was substantial evidence on the record that Blais was the aggressor in this instance, entered into a fight in the presence of a civilian, was the officer in charge at the time and made untruthful statements after the fact. Accordingly, the Committee did not abuse its discretion when it sentenced Blais to 25 days suspension without pay.
 B Specific Statement of Facts
The Appellant next argues that the Committee abused its statutory authority by basing its punishment on guilty findings of seven charged offenses stemming from the same incident. Specifically, he argues that his punishment was partially based on two statements that vary only slightly and are supported by one rather than two separate *Page 15 
findings of guilt. Because this is really a two pronged argument, the Court will address these arguments separately.
 1
First, the Appellant argues that his punishment was partially based on two charges that vary only slightly in language. He argues that § 2.12 and § 2.14 of the Department Rules are "essentially the same charge with 2.12 applying generally to anytime on or off duty and 2.14 governing courtesy towards fellow personnel particularly while on duty."
The Appellee responds that Appellant is challenging a procedural irregularity and any procedural challenge should have been raised at the beginning of the hearing. The Apellee further responds that Appellant has waived his right to raise the issue of similarity or overlapping language of the Department's rules and regulations.
The Superior Court will not entertain an issue that is raised for the first time on appeal. Wickes v. Kofman,121 R.I. 698, 703-704, 402 A.2d 591, 594 (1979). Furthermore, it is well established in Rhode Island "that this court will consider only those matters that have been properly raised in the court below. Thus, a party who fails to assert his objections is deemed to have waived his rights on appeal." Fiske v. Macgregor, Div. ofBrunswick, 464 A.2d 719, 726 (R.I. 1983) (citations omitted);see Iselin v. Retirement Bd. of Employee's Retirement Sys. ofRhode Island, 943 A.2d 1045 (R.I. 2008.)
In this case, the Appellant received a copy of the formal charges and was aware of the charges against him before the Bill of Rights Hearing. (Tr. Nov. 24, 2008 at 53-55.) At no time during the trial did he object to the similarity of any of the charges before him. Furthermore, before the hearing began, the chairman specifically asked "[a]ny other *Page 16 
issues? Questions?" and both attorneys answered "no." (Tr. Nov. 12, 2008 at 8.) The issue regarding the similarity of the charges is one that could have been brought up at the hearing, and because the Appellant failed to object to any of the charges or address the issue, this Court will deem that issue waived.
 2
The second part of Appellant's argument is that the Committee relied on one "duplicative statement finding guilty to support two `independent' charges.'" Appellant relies on § 42-28.6-11(b) and the cases of Interstate Navigation Co. v. Division ofPublic Utilities and Carriers, 824 A.2d 1282 (R.I. 1987) andIn re Simoneau, 652 A.2d 457 (R.I. 1995) for the proposition that a different statement of facts needed to be relied upon for each charge.
Apellee responds that In re Simoneau and InterstateNavigation could be differentiated from this situation. Appellee explains that § 42-28.6-11(b) and the Rhode Island case law does not stand for the proposition that each charge must have a different finding of fact.
The language of § 42-28.6-11(b) states in full:
 Any decision, order, or action taken as a result of the hearing shall be in writing and shall be accompanied by findings of fact. The findings shall consist of a concise statement upon each issue in the case. Copies of the decision or order and accompanying findings and conclusions shall be delivered or mailed promptly to the law enforcement officer or to his or her attorney or representative of record and to the law enforcement agency or to its attorney or representative of record.
The language at issue in Appellant's argument is "[t]he findings of fact shall consist of a concise statement upon each issue in the case." Nowhere in the case law of Rhode Island *Page 17 
does it indicate that this language therefore means the findings of fact shall consist of a different statement for each issue in the case.
The Appellant relies on Interstate Navigation and In reSimoneau for his position. In Interstate Navigation, which did not involve § 42-28.6-1 et seq., the holding concerned a fine assessed to the witness for pleading the Fifth Amendment when she did not have the right to do so. The court would not allow the $22,000 penalty[2] for each of the 22 questions she was asked. The court allowed only one $1000 penalty because it found the questions asked were essentially the same question. Noted the InterstateNavigation Court, "[w]e refuse to read slight variations of the same basic question to permit the Division to fine interstate $1000 for each variation of that question." Id. at 1287. This case involves a completely different situation and statute from that noted in Interstate Navigation. The facts that the committee relied upon arose out of the same incident but did not arise out of similar questions. The incident was a physical altercation that simultaneously violated numerous rules and regulations. Accordingly, Appellant's reliance on InterstateNavigation is misplaced.
Appellant also argues that Simoneau stands for the proposition that each charge must have a separate and distinct finding of fact. That proposition was not the holding ofSimoneau. In Simoneau, the hearing committee had found the defendant not guilty of seven charges and under each charge had stated "insufficient evidence had been presented." The hearing committee in that case provided no findings of fact to support the position of insufficient evidence presented. Id. at 460. TheSimoneau Court, relying on Dionne v. Jallette,641 A.2d 744 (R.I. 1994), stated that a "hearing panel must, at a *Page 18 
minimum, indicate the evidence upon which it relies in reaching its conclusions." Simoneau 652 A.2d 461. The Simoneau Court further explained the reason why it was important to follow § 42-28.6-11(b), requiring a specific finding of fact. It stated, "We indicated that `the reasons have to do with facilitating judicial review, avoiding judicial usurpation of administrative functions, assuring more careful administrative consideration, helping parties plan their cases for rehearings and judicial review, and keeping agencies within their jurisdiction.'" Simoneau, 652 A.2d 461 (citingHooper v. Goldstein,104 R.I. 32, 44, 241 A.2d 809, 815 (1968)). Therefore, Appellant's reliance on Simoneau is also misplaced.
In this case, the Committee provided statements of fact for each charge. The statement of facts was the same statement for §§ 2.6, 2.9, 2.12 and 2.14. The statement of facts was
 [s]tatements provided by the Rhode Island State Police and the internal investigation conducted by Lieutenant Lareto Guglietta disclosed that on May 1st at approximately 2315 hours you asked Patrolman Bouchard to re-fingerprint a prisoner. Patrolman Bouchard responded that re-fingerprinting the prisoner was not necessary. You disagreed and when Bouchard refused to do the fingerprinting as requested, you did it yourself. Later you went to the dispatch area, asked to speak with Bouchard and you and Bouchard went to the squad room. While in the Squad room a verbal argument ensued between you and Bouchard. The verbal dispute escalated into a physical altercation that you initiated by punching Patrolman Bouchard. The investigation revealed that after the initial exchange of punches Dispatcher Biddiscombe managed to separate the two of you by grabbing Patrolman Bouchard and holding him back. While Patrolman Bouchard was being restrained you renewed the combat by getting up and swinging at Bouchard again. The Continuing altercation disrupted the operation of the department by keeping on duty officers (you and Bouchard) from performing their assigned duties, a police dispatcher was interrupted from *Page 19 
his assigned duties and tipping over furniture, breaking the podium, splattering blood and causing papers to be scattered around the roll call/squad room. In addition on duty officers were summoned to headquarters and two Lieutenants responded from their homes. The actions particularized above are in violation of Burrillville Police Department Rules and Regulations, Section 2.6 Rules governing Conduct, Section 2.9 Performance of Duty, Section 2.12 Courtesy and Section 2.14 Conduct Toward Personnel and Department. (Decision at 6 and 8.)
Each charge was separately numbered and addressed in the decision, and the statement of facts was repeated in the pertinent charges. The findings of fact listed under section §§ 2.6, 2.9, 2.12 and 2.14 clearly provide this Court with specific findings to make determinations on appeal. These facts "facilitate judicial review" by providing specific details of what the Committee determined to have happened and how it was a violation of the rules. See generally Hooper v. Goldstein,104 R.I. at 32, 241 A.2d at 809. The statement clearly indicates that Blais was the aggressor, a civilian witnessed the altercation, damage was caused to the squad room, and the combatants were disrupted from performing their duties. These facts provided ample evidence for this Court to determine that the decision was based on "substantial evidence." The Committee did not abuse its discretion or act in excess of its statutory authority when it used the same detailed finding of facts for different charges. Substantial rights of Appellant have not been prejudiced.
 V Conclusion
This Court finds, after reviewing the record as a whole, that substantial and probative evidence exists to support the Committee's decision, that the decision was not arbitrary and capricious, was not an abuse of discretion, and was not clearly erroneous *Page 20 
and was not in excess of the statutory authority of the Committee. Substantial rights of the Appellant have not been prejudiced. Counsel shall submit appropriate judgment for entry.
[1] This Committee did not hear or decide the case regarding Bouchard. There was testimony at Blais's hearing that Bouchard received a two day unpaid suspension for disobeying an order from shift commander, not for his actions in the altercation. (Tr. Nov. 12, 2008 at 143; Tr. Nov. 19, 2008 at 100.)
[2] The statute at issue in that case was § 39-2-8, which allowed a maximum $1,000 penalty for a violation of the section by a public utility.